Our first case on today's docket is the case of Margaret Doehler as a menstruator in the state of Maryland, who has been deceased, versus Rebecca Christie, M.D., Southern Bay, Helen Long, and Alton Memorial Hospital. We have Ralph Bloodworth as part of the appellant. And we have Ted McDonald for the appellate. And you may begin when you're prepared to do so. Yes, ma'am. Yes, you may. Good morning. Good morning. May it please the Court. Counselor. My name's Ralph Bloodworth. I'm here on behalf of the appellant in this case. This is the case of Marlee Midden on behalf of her daughter, Margaret Doehler. It's a case arising out of a malpractice action in Madison County, Illinois. Specifically at issue here is a summary judgment granted in favor of nurses Day and Long. The doctor and the hospital itself are not involved in this appeal. But the summary judgment completely granted in dismissing Day and Long from the case. Relevant facts of this case are Ms. Midden presented to Alton Memorial Hospital at about 4.35 p.m. with a heart attack. Treatment was picked up by Nurse Day, Nurse Long, and Dr. Christie at the hospital that day. She, indeed, was having a heart attack. No dispute about that. At that hospital that day, no doubt that those three people participated in the care and treatment of her. Eventually she was transported, and that was at 4.35 when she presented, transported two Christian brothers northeast at 7.25, just shy of 180 minutes, three hours. She died later on there as a result of the heart. A failure to revascularize is the cause of death in this situation. At issue in the summary judgment below that the judge granted, Nurse Day and Nurse Long essentially said there was no evidence regarding causation and anything that they did to cause the injury or death of the plaintiff in this situation. We contend that there is a question of fact regarding, first, the element of causation. Primarily the only testimony in the case was Dr. McDonough, a cardiologist, on behalf of the plaintiff, who said that the cause of death was the failure to revascularize in a timely fashion, time being the key here, because as the testimony pointed out in our brief, and that is contained therein in the record, you've got to do something within 90 minutes. You've got to do a heart cath within 90 minutes. Presentation, 4.35, that would have been 6.05. She's still not transferred until 7.25. And therefore that's the only testimony about the cause of death is the failure to complete revascularization process. The reason they had to transfer, that hospital, Alton Memorial, did not do the heart cath at that time. So what they had to do and what the question is, they administered TPA there at the hospital. And so that's the question at the time. Did the nurses play a role in that failure to complete revascularization process? The judge at the trial court level said no, but clearly there's a question of fact about that, about, number one, when was the decision made to transfer? Number two, why was she still there at 7 or transferred not until 7.25? That's well past the 90-minute deadline, so you've got to give the TPA. That was not done in this case. And the question of fact is, what role did the nurses play in causing or contributing to cause? They don't have to be the sole cause of it. Dr. Christie, it can be a combination of things. It has to be a cause. And certainly here there's a question of fact about that, at least for the trier of fact, the jury to decide. For the trial judge to take it completely out of the jury's hands, when that testimony there, the time and the delay in getting that process completed is the question here. Can I ask you a question regarding prospect cause? Your nursing expert certainly testified regarding deviation from standard of care, in her opinion. She's not qualified to give expert testimony regarding causation, correct? That's essentially correct. That's a medical opinion. And so help me understand then how you tie in the proximate cause of the impact or contribution of the nurses. Certainly. And again, that's through the questions created through Dr. Madani's testimony, the failure to complete the revascularization process in a timely fashion. Again, time being the key here. That's where it's tied in. There's testimony regarding deviation from the standard of care by the nurses, the hospital's own nurse. Nurse Kamenetsky testified as well about the policy and procedures and guidelines and transferring time factor. But causation, once again, and the nurses' role in that gets back to the question of fact presented by Dr. Madani's testimony, the delay, once again. Do you think you need a doctor to say, I believe the nurses' inactions or omissions contributed to the cause of death? I don't think it has to be in that many words. I think it has to be – it's a question. Again, causation being a question of fact, whether it's Dr. Christie, the ER doc, or the nurses both together playing a role in it. So I don't specifically think in so many words you need that, hey, these nurses, this is a cause of the death of the patient. When the doctor says, the only doctor, it'd be different maybe if there's another doctor saying that this is not a cause of the death. And certainly Dr. Christie may come to trial and say that, hey, the nurses did nothing wrong. That's where we get into that role with Snelson, a case that's greatly discussed in the briefs and at the trial court level in the argument. But when Dr. Madani, the cardiologist testifies that the time, and then we have so much testimony and questions about time and the nurses' role and what did they do, all those are questions of fact when it's undisputed as to what caused the death, the failure of complete revascularization, either administering the TPA or transfer from door to catheterization within 90 minutes of the presentation, which did not occur to her. I mean, she's there 175 minutes before the transfer takes place. Why wasn't the TPA done? It was not done. So all these are questions. And I think when the doctor, you know, once again, getting back to answer your question directly, there's testimony that creates the question of fact that the delay in the time caused or at least contributed, or no doubt caused the death of our client. But the nurses' role in that is the question. For me, in your issue statement, you say the defendants admit they are not entitled to summary judgment. What's the basis of that? The basis of that is at the trial court level causation was the primary element argued in the motion for summary judgment. And, you know, we presented Dr. Madani's testimony, and the judge found it the other way at that point in time. But in there, there were actually four separate allegations of a duty and breach of that duty. Basically, they addressed the motion was on causation, and we assert that because there's still question of fact regarding the duty and the breach of that duty and those other elements and the transfer. That's why we, you know, alleged they admit that there's still questions of fact and that the summary judgment was improper and should not have been granted at that point in time. Any other questions on those elements? As far, I mean, clearly there's a question of fact here that the trial fact should have been provided the opportunity to decide. It shouldn't have been taken away by the trial court judge. There's evidence in this case of duty, breach of that duty, by our expert, Nurse Bowler, as well as the defendants' expert witness, Nurse Kamineski. She provided testimony about the policies and procedures and guidelines at Alton Memorial Hospital at that time of transfer, as well as Dr. Madani, as to the causation of the failure to acquire the revascularization. And once again, the key question being time, and that's why we'd ask that you reverse the trial court's decision in granting the motion for summary judgment and remand it back with the nurses included in this case. Still the case goes on against Dr. Christie and against the Alton Memorial Hospital, but the nurses, clearly there's a question here as to their role in that delay and their role in that process. And that's why we would ask once again that you remand it back with the nurses in the case and find that there was a question of fact for the trial fact. So is there any evidence that if the nurse had recommended TPA, the doctor would have done it? And that's part of the question process. Dr. Christie will testify or did in a deposition that it was being considered, and that's a big part of the argument here as well. But once again, the nurses know the time frame or should have known that time frame of, number one, the time of transfer, 90 minutes from presentation to catheterization where you give that TPA. If not, you go up the chain of command because the patient has exactly what happened here, is dead, dies. That's the time frame that you have to do that. So whether or not they've got to make sure, number one, the doctor is aware of the situation, knows how long that transfer is going to take place. And again, all these are timing questions, questions of fact, when you hear all of the evidence in here, and that's why it should be remanded back. Whether or not, and Dr. Christie may very well say, hey, they could have told me give the TPA and keep telling me that, but Dr. Christie can come to trial and say that, and then we're dealing with the Snell's tissue where maybe the nurses, you know, they're out at that point in time. But that's missing right now. Dr. Christie hasn't said that. Dr. Christie said, I considered it, but not that the nurses were telling me that, hey, give it, give it, give it. Or the nurses certainly, if the doctor doesn't, given the time frame and what's going to happen, when they know that they don't do those catheterizations at that hospital, they know that fact and they still don't talk about the TPA or go up that chain of command and know that the process can't be completed in that 90-minute time frame. You're talking 6.05 from 4.35. Here we are at 7.25, once again, before that transfer takes place. Any other questions that you may have at this point in time? I don't think so. Thank you. Thank you. We'd ask that you would have the opportunity to respond shortly. Thank you. Thank you. Mr. McDowell, can you tell me who all you represent? Yes, Your Honor. In this appeal, I represent Sally Day and Helen Long. I also, in the underlying case, represent Holt Memorial Hospital. Okay, but not Dr. Christie. I do not represent Dr. Christie. In fact, there was a comment in the brief, which is erroneous. The statement was that I represented Dr. Christie as well. That's not correct. Dr. Christie was not an employee of the hospital, but rather of a separate group that provided emergency room services. She is represented by Henshaw Culbers and Terry Drew. So you have hospital and both the nurses? I have hospital and both the nurses. That is correct. And I think it's important, and I want to address the questions that you asked, but I think it's important to take a look at it and recognize that in this case I do represent two individual nurses. The hospital is not in question in this appeal. It's solely with respect to these two nurses who were added to this case in 2004, at least a year after the initial case was started. In the original complaint, there was a laundry list of all of the problems the plaintiff had with charting, with the performance, with the conduct of the individual nurses. And what happened in that is that they developed it. They actually produced Dr. Madani for a deposition, and his deposition was taken in 2007, two years after his deposition was taken. The plaintiff then filed an amended complaint, a third amended complaint, which basically rebooted their claims and asserted a whole other area of claims to their case. Dr. Madani was never offered for deposition, never given additional opinions, never tendered anymore. The only expert they tendered with respect to these new allegations and with respect to ER procedures was their ER expert, Dr. Frank Baker. I'm going to talk about that in a minute. So the point is these two individual nurses, who had been part of this case for seven years, six years at the time, Dr. Judgmentosian, granted summary judgment. The issue is did the plaintiff demonstrate evidence in all of the requirements necessary to make a case against each of those two individuals? The question here is, is counsel suggested that we don't get to Snelson, we don't get to Gill. That's not correct. Snelson and Gill have laid out the blueprint for how you establish cause of action against a nurse in a hospital setting. And it applies to this case, both of those cases. And in fact, in those cases, the argument was made that's similar to the one they've just made. That is that we have this question of time. The question of how long it should have taken to properly diagnose and treat a patient. And they try to drag in individual nurses into this question of time and argue that, well, if they participated in the process somehow, that they then are responsible ultimately for contributing to the condition of the plaintiff. That was rejected by both Gill and Nelson. And there, as you questioned, Your Honor, and you said, do they have to tie in specific deviations that they allege to the ultimate outcome with expert testimony? The answer is yes. Comment was made, well, not in so many words. The answer is yes, they do. That is required by both of these Illinois Supreme Court cases. Now, in this case, for example, they talk about TPA. Let me interrupt you. Sure. Snelson says that there was no evidence that the doctor would have done anything different had they been told. Correct. Okay. And here, isn't the allegation that the nurses failed to tell the doctor that the patient was not being revascularized? Well, that is an allegation, but if you recall in the Snelson case. It's a question of fact, then, isn't it? Well, no, no. No, the question is the issue is it's not a question of fact. The plaintiff has to demonstrate, for example, by competent testimony. First of all, did the nurses say anything to the doctor, Dr. Christie, all right? Dr. Christie testified that she already considered that, that this issue of TPA, she considered it. She rejected it because TPA, TPA is a very complicated decision-making process. It involves many factors, and it's a very dangerous drug. So if you, it's like putting Drano in somebody, essentially, to bust a clot. If there's any leakage, if there's any damage to the blood vessels, any place, if somebody's been taking blood-thinning medication, all right? And the potential is that if it gets outside of the vessel, it can kill the patient. That's why it's so dangerous, all right? Now, the question comes in very, very early on. What a doctor's faced with is the earliest time for benefit is really early on. They don't even want to give it six hours after symptoms are undertaken. Now, the point is she has to evaluate a patient who comes in. And in this case, this patient hit the emergency room at like 1630. At 1635, she crashed. She coded. And they had to do CPR and bring her back. Chest compressions alone on an elderly person can create bleeds, can create problems, can create contrary indications for administering TPA. In addition, she has to get some information about what is the history, what's the medical history on this woman. She has to know when did the symptoms start. When did you start having these symptoms? Because the longer you get away from the initial symptoms, the less benefit there is on this basically sliding risk-benefit curve. But isn't that your theory of the case versus his? No. No, it isn't. No. No. Even his experts. What's interesting is the only expert who testified for the plaintiff on this issue about TPA, whether it should have been given, whether the doctor should have been told, whether they should have gone up the chain of command, is Dr. Frank Baker. And what's interesting is that's their expert. And, in fact, one of the lawyers from their office toward the end of that deposition asked, said, well, what about TPA? Should they have suggested something to the doctor? If the doctor didn't give it, should they have urged him to do something? Should they have gone up a chain? Dr. Baker said no. What about Madani? Madani. Madani. Never said anything about that. About TPA. What he said about TPA generally was the doctor should have given it. Well, that's what I'm saying. Isn't that a difference of opinion? No, no. The problem is this. It has to do with the doctor's decision. What we're talking about, is there a question of fact about whether Dr. Christie should have given TPA? Yes. Yes. Now, the question is, the issue is it doesn't translate to the nurses. But it wasn't their expert testimony from their nurse saying that they should have given the TPA and should have gone up the chain of command. Okay. Now, that's exactly right. The plaintiff in this case, Margaret Boulder, who's her own expert, she testified that as a nurse, she believed a nurse should have told the doctor about TPA. And should have gone up the chain of command. Where they're flawed is, the other question we had is, is there any evidence about what would have happened after that? Is there competent expert testimony that ties that issue to the outcome in this case? And that is, well, if they'd gone up the chain of command, where would they go? They'd go to a nursing supervisor. Well, from a nursing supervisor, what happens? Is the doctor then brought in? Is a different doctor come in? Does a different doctor make the decision? How is it done? When is it done? They had no testimony at all with respect to any of that. And they had no testimony to tie in her criticisms, therefore, to the outcome. And that's exactly what Dr. Baker, their own expert, testified to. He said, it's a doctor's decision. It's not a nursing decision. It's too complex for a nurse. And he found no criticism of the nurses whatsoever in this case. I thought there was a distinction between advising a doctor, and obviously, a doctor is the one who gives the- Gives the TPA?  Right. Now, the question is, isn't that piece about, should they have said something to the doctor? Actually, that's kind of like what we have in Snelson and Gill. Well, except that I thought in Snelson, they were foreclosed partly because the doctor said, I would not have done what was recommended. Yeah. The only testimony in this case, the only testimony in this case from Dr. Christie is, I knew about TPA. I had evaluated TPA. I was not giving TPA. All right? Which is similar to the other two cases where they said, well, if the nurse had told the doctor about the complaints, all right, something different would have occurred. There is no testimony something different would have occurred here. No testimony whatsoever. And moreover, again, you've got to have an expert medical causation tying that conduct to the death. There isn't any. All they do is rely upon one comment out of Madani's testimony two years before, not with respect to these issues, about revascularization in general. So they don't have any doctor tying any specific act of any of either of these nurses to the death. Don't have it. The other interesting thing in the comment that they made is, well, this Nurse Kamenitsky issue about the timing of transfer, the procedure for transfer. All right? That's a total red herring. They spent six pages in the brief talking about that. Nurse Kamenitsky testified about the procedure, how it's done, who calls whom, how do you get a bed, what happens when they call back and have a bed. After they have a bed and you confirm that, you then make a call over there to the nurses. You discuss it with the nurses. You give them a report. Then we call ARCH. ARCH comes and picks them up. The procedure for doing it. And they suggested, well, Nurse Long and Nurse Day participated and were there and maybe would have taken one of those steps or whatever it is. They never took their deposition. They never asked them one question about that. There's no testimony on any of that. Interestingly, despite all these pages, they never pled it. That was never even a part of their 30-minute complaint. It wasn't even in there. So that whole issue about the procedure for how you transfer a patient is not even in the case. And there's no expert testimony. There isn't any fact testimony on that at all. Moreover, factually, if you just look at it in this record, by the time they call ARCH ambulance, and it's air ambulance, so ARCH sends a helicopter over to pick up Ms. Mitten. When they got there, she had crashed again. She wasn't even stable then. They actually had to come in and actually work on her, do CPR, to try to bring her back with chest compression for 15 or 20 minutes before they could even load her. There's a whole issue here about the fact that this timing issue that they have is really broken up into several parts. But the part about the procedure for transfer is not in this case. It's not in the case. The other issue about should they have told Dr. Christie about how much time it would take and that they didn't know how much time it would take to make a transfer and that Dr. Christie somehow didn't know how much time it would take to make a transfer and that that would have made a difference. Interesting observation. Did they develop any evidence on that that suggested that these people didn't know how long it takes to do a transfer from Alton Memorial Hospital? No. Never took their depositions again. Never asked any questions. Never asked Dr. Christie. They have absolutely no evidence to support that sort of second bucket of allegations. There isn't any evidence. Moreover, there isn't any expert evidence, expert testimony that suggests what would have happened, how do you connect any of that. So the issue that they have in the case essentially is this notion of TPA, of should Dr. Christie have given TPA to this patient. And again, the only expert testimony they have is Dr. Baker, who says it's not a nursing decision and it did not play a role in causing the death. The question is a single case, a single question, a single issue, and that is, did Dr. Christie exercise appropriate judgment in making this very complex, difficult decision to administer TPA? And she concluded that it wasn't appropriate. That's the case that's left to try against Dr. Christie and the hospital below. And I think Judge Matossian was correct in saying that these individual nurses did not belong in this case any longer. The plaintiff had approximately six years to develop testimony, including connecting expert testimony, and didn't do it. So we believe that the judgment in favor of nurses Long and Day should be affirmed by this court. Thank you. Thank you. Mr. McDonald, Mr. Goldberg, do you have a comment at all? Yes, I do. A couple of points. The time factor, that is the question here, and that is a question of fact. And once again, Dr. Madani did testify that the failure to revascularize in a timely fashion is the question. You know, that was the cause of death, no doubt about it. The nurse's role in that, whether it be the cause, a cause, or part of the cause is the question of fact in this situation. There's no doubt that that caused her death. That's the only testimony about that. Regarding whether or not the nurses had a duty to do anything, they have to know that time frame. They either have to give that TPA or recommend it. That's their duty. They don't give it. You were right to ask that question under Snelson. It is a medical decision to give it, and giving it is a medical procedure that the nurses do not do. But when you can't do that hard cap there, you've got a person there presenting to the ER at 435, and the options are the TPA or transfer, or they're going to die, and this patient died. And that's what happened here. They didn't give the TPA. They didn't go up that chain of command. They didn't transfer in a timely fashion. That was the doctor's decision. The doctor considered and rejected giving the TPA, whether the nurses would have recommended it. What's relevant about that? The doctor felt it was contraindicated to what she testified to, but that was based upon the performance of partly CPR. Dr. Barnes said, and our expert said that, number one, they should have done both. The CPR did not prevent the giving of the TPA, and they should have transferred. If they don't transfer in time, the TPA has to be given. The nurses know this is going on. They've got to go up that chain of command, and that doctor doesn't get it done in time, or the patient dies, which is what happened here. And that's the question of fact, once again, the time. The nurses were there. They knew this was going on. They knew the doctor wasn't giving the TPA. They were involved in the care and treatment of Ms. Midden in that hospital emergency room on that day. 6-17, they get the call from Christian Northeast that the bed is available and the transfer can take place. Transfer doesn't happen after that until 7-25. That's 175 minutes from door until transfer. At 6-17, which is outside that 90-minute window of that hard cap, the patient's still sitting in their emergency room, and that's the time factor of the question. 7-25 is when the transfer starts taking place or is accomplished? Assume it's accomplished. Assume they land at 7-25. I don't know the answer to that question. I apologize about that. But at 6-17, there's documentation that that patient's in that emergency room. That's already past the 90-minute window right there. 6-05 is the 90-minute window. So they have to give that TPA. And the nurses did not follow up on that, did not go up that chain of command when they knew that the doctor was not doing it. And that's the question right there. That's part of the question. All these are questions of fact that we're talking about the time, what they should have done. There's no question that there were duties here and evidence of breach of those duties, and that's the question for the prior fact. We ask that you remand it, overturn it. Decisions were wrong by the trial court level. There are clearly questions of fact here regarding all those issues. What other questions do you guys have? No. Thank you, Mr. Butler.  Thank you for your time. Thank you for your time.